Filed 4/22/22  Rodriguez v. Southwest Airlines Co. CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| MIGUEL RODRIGUEZ,<br><br>      Plaintiff and Appellant,<br><br>v.<br><br>SOUTHWEST AIRLINES CO.,<br><br>      Defendant and Respondent. | B311405<br><br>(Los Angeles County Super. Ct. No. 18STCV03694) |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Stephen I. Goorvitch, Judge.  Affirmed.

Schneberg Law, Kyle Schneberg; Jeff Lewis Law, Jeffrey Lewis and Sean C. Rotstan for Plaintiff and Appellant.

Jetstream Legal and Richard G. Grotch for Defendant and Respondent.

_____

During boarding, airline passenger Eric Lopez (Lopez) refused to comply with preflight safety protocols for stowing baggage or to disembark voluntarily. Police were called, and all other passengers began to disembark. Another passenger, Trenton Scott Pickett-Evans (Pickett-Evans), approached and assaulted Lopez, causing injury to passenger Miguel Rodriguez (Rodriguez), who then sued the airline for negligence. The trial court granted the airline summary judgment, finding the airline owed no duty to protect Rodriguez from Pickett-Evans's unforeseeable assault. We agree and affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.    The Assault

On March 2, 2018, Rodriguez and his friend Lopez boarded a Southwest Airlines Co. (Southwest) plane in Dallas, Texas to fly to Los Angeles. The two men had seats in the same row; Rodriguez sat down in the window seat and Lopez took the aisle seat. The middle seat between them was empty.

Toward the end of the boarding process, a woman entered the plane pulling a roller carry-on suitcase. Southwest Customer Service Supervisor Chad Hardin (Hardin) began helping the woman stow her suitcase in the overhead compartment above Lopez's seat. Hardin discovered two small bags in the compartment. He asked to whom the bags belonged, explained he needed to make room for the suitcase, and removed them.

Rodriguez and Lopez identified themselves as the owners of the bags. Hardin asked the men to stow the bags underneath the seats in front of them. Rodriguez complied, but Lopez refused, stating he "had a right" to keep his bag in the compartment "to maintain his leg room." Hardin gave Lopez the choice of stowing his bag as directed or deplaning voluntarily. Lopez rejected both options, and the two men argued. Rodriguez believed Hardin's behavior was unnecessarily rude and aggressive. Lopez grew angrier and raised his voice.

Hardin stepped off the plane to call for police assistance and to advise the operations department the flight may be delayed. Hardin then announced to the passengers that he had been involved in an

2

"issue" or an "argument" with a passenger and "everyone would possibly have to deplane." Hardin remained at the bottom of the jet way or just outside the front aircraft exit to wait for the police.

Passengers were clearly upset by Hardin's announcement. A flight attendant in the back of the plane heard Lopez and Rodriguez using "loud profanity." She walked over and offered to help. Lopez angrily responded that Hardin should not have " 'touched my shit.' " The flight attendant returned to the back of the aircraft.

By now passengers were milling about the cabin and beginning to disembark. The aisles were crowded; no flight attendants were nearby. Passengers from the back of the plane moved toward the front exit, directing negative comments to Lopez and Rodriguez.

Passenger Pickett-Evans was seated a few rows behind Lopez and Rodriguez. As he was deplaning, Pickett-Evans stopped next to Lopez's seat and demanded that Lopez leave the aircraft. The two men argued. Several passengers attempted to alert flight attendants to the confrontation.

Pickett-Evans then took a "fight stance," and Rodriguez stood. Picket-Evans pushed Lopez. In response, Lopez stood and raised his hands "defensively." Pickett-Evans punched Lopez several times in the forehead. He also struck Rodriguez's arm. Lopez lost his balance and toppled onto Rodriguez, who in turn fell and seriously injured his knee. Rodriguez described the incident as "happen[ing] pretty fast." Rodriguez estimated the time from Pickett-Evans's initial approach to his assault on Lopez was one to two minutes.

Some passengers managed to restrain Pickett-Evans. The aisle cleared, and a flight attendant was able to approach. Shortly thereafter, the police arrived and escorted Lopez and Pickett-Smith off the plane. The remaining passengers disembarked. Rodriguez, who was unable to stand, left the plane in a wheelchair. He received medical attention before traveling to Los Angeles on a later flight.

## II.    The Lawsuit

Rodriguez filed suit against Lopez and Southwest for personal injury damages. Rodriguez asserted one cause of action for negligence,

alleging Southwest breached its duty of care as a common carrier by failing to "control . . . the circumstances of [Rodriguez's] transportation while a passenger."

Southwest filed an answer, denying liability and asserting various affirmative defenses.

## III. The Summary Judgment Motion

Southwest moved for summary judgment, arguing in part it had no duty to protect Rodriguez from an unforeseeable intentional act of harm by a fellow passenger.[1]

Rodriguez filed opposition. He argued: (1) Southwest, as a common carrier, had a duty to protect passengers from assaults by fellow passengers; and (2) there were triable issues whether Southwest reasonably exercised that duty by failing to foresee the likelihood of a physical altercation between passengers and Rodriguez's resulting injury.

Following a hearing, the trial court granted Southwest's summary judgment motion. The court found that although common carriers like Southwest have a duty to protect passengers from assaults by fellow passengers, there were no triable issues of material fact indicating that (1) the assault was reasonably foreseeable to Southwest; and (2) Southwest would have been able to prevent Rodriguez's injury. Thus, the court determined Southwest did not have a duty to protect Rodriguez from the harm he suffered in this instance.

After judgment was entered on the ruling, Rodriguez filed this appeal.

## DISCUSSION

## I. Summary Judgment

"A defendant is entitled to summary judgment if it can 'show that there is no triable issue as to any material fact.' [Citation.] The defendant bears the initial burden of establishing that the plaintiff's cause of action has 'no merit' by showing that the plaintiff cannot

---

[1] Lopez had not been served with the complaint when Southwest's summary judgment motion was filed.

establish 'one or more elements of [the] cause of action.' [Citation.] If this burden is met, the 'burden shifts' to the plaintiff 'to show that a triable issue of one or more material facts exists as to that cause of action.' " (*Issakhani v. Shadow Glen Homeowners Assn., Inc.* (2021) 63 Cal.App.5th 917, 924, fn. omitted.) We independently review a grant of summary judgment. (*Hampton v. County of San Diego* (2015) 62 Cal.4th 340, 347.)

## II. Southwest Had No Duty To Protect Rodriguez

Rodriguez contends Southwest Airlines was negligent in failing protect him from being injured by the assault because it was foreseeable.

To establish a cause of action for negligence, a plaintiff must allege facts showing a legal duty to use due care, breach of the duty, causation, and damages. (*Kesner v. Superior Court* (2016) 1 Cal.5th 1132, 1158.) Duty is a threshold issue, a question of law for the court, and reviewed de novo on appeal. (*Id.* at p. 1142.) Every person has a duty in his or her activities to exercise reasonable care for the safety of others. (Civ. Code, § 1714, subd. (a).) Yet this duty "is not absolute"; a defendant does not necessarily owe every plaintiff a duty of care. (*Brown v. USA Taekwondo* (2021) 11 Cal.5th 204; 215 (*Brown*).) Generally, " 'one owes no duty to control the conduct of another, nor to warn those endangered by such conduct.' " (*Regents of University of California v. Superior Court* (2018) 4 Cal.5th 607, 619 (*Regents*); accord, *Delgado v. Trax Bar & Grill* (2005) 36 Cal.4th 224, 235 ["as a general matter, there is no duty to act to protect others from the conduct of third parties"].)

But there are exceptions. Whether a defendant is obligated to protect a plaintiff from third party harm involves a two-part inquiry: "First, the court must determine whether there exists a special relationship between the parties or some other set of circumstances giving rise to an affirmative duty to protect. Second, if so, the court must consult the factors described in *Rowland* [*v. Christian* (1968) 69 Cal.2d 108, 113 (*Rowland* factors)] to determine whether relevant

5

policy considerations counsel limiting that duty." (*Brown, supra*, 11 Cal.5th at p. 209.)

### A. The Common Carrier-Passenger Special Relationship

A special relationship "is typically where the plaintiff is particularly vulnerable and dependent upon the defendant, who, correspondingly, has some control over the plaintiff's welfare." (*Kockelman v. Segal* (1998) 61 Cal.App.4th 491, 499.) The special relationship exception may also apply when the defendant is able to control the conduct of the dangerous third party. (*Brown, supra,* 11 Cal.5th at p. 211.)

The relationship between common carriers and their passengers is a classic example of a special relationship. (*Regents*, *supra*, 4 Cal.5th at p. 620; see Civ. Code, § 2100 [common carrier "must use the utmost care and diligence for [passengers'] safe carriage, must provide everything necessary for that purpose, and must exercise to that end a reasonable degree of skill"].) Thus, the first part of the inquiry has been met. As a common carrier Southwest would ordinarily owe a duty to protect its passengers on the aircraft from third party harm and to control dangerous third party passengers.

### B. The *Rowland* Factors

For the second part of the inquiry, the *Rowland* court instructs us to balance foreseeability-related factors and public policy factors in deciding whether, in these circumstances, to depart from an implicated duty of care. (See *Brown*, *supra,* 11 Cal.5th at pp. 217–218; *Cabral v. Ralphs Grocery Co.* (2011) 51 Cal.4th 764, 771.) Guided by these factors, we conclude that expecting an airline to protect a passenger from a fellow passenger's unforeseeable assault in these circumstances would impose an untenable burden on both the airline industry and airline passengers.

#### 1. The *Rowland* Foreseeability-related factors

The foreseeability-related factors are "the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury,

6

[and] the closeness of the connection between the defendant's conduct and the injury suffered." (*Rowland, supra*, 69 Cal.2d at p. 113; see *Cabral v. Ralphs Grocery Co., supra,* 51 Cal.4th at p. 771.) Of these three factors, whether the injury was foreseeable is the most important in determining whether an exception should exist to the duty to protect. (*Regents, supra*, 4 Cal.5th at p. 629.) Our task " 'is not to decide whether a *particular* plaintiff's injury was reasonably foreseeable in light of a *particular* defendant's conduct, but rather to evaluate more generally whether the category of negligent conduct at issue is sufficiently likely to result in the kind of harm experienced that liability may appropriately be imposed.' " (*Cabral,* at p.772; accord, *Regents,* at p. 629.) We do, however, evaluate the kind of third party conduct involved in light of all the surrounding circumstances as probative in assessing generally whether the category of Southwest's alleged negligent conduct is sufficiently likely to result in the kind of harm plaintiffs experienced. "What is 'sufficiently likely' means what is ' "likely enough in the setting of modern life that a reasonably thoughtful [person] would take account of it in guiding practical conduct." ' " (*Martinez v. Bank of America* (2000) 82 Cal.App.4th 883, 895.)

Common carriers have never been considered as insurers of passenger safety. (*Lopez v. Southern Cal. Rapid Transit Dist.* (1985) 40 Cal.3d 780, 785.) For this reason, a common carrier's duty to protect has been limited to foreseeable third party harm. (*Terrell v. Key Sys.* (1945) 69 Cal.App.2d 682, 686.) The record shows Lopez's belligerent refusal either to comply with the boarding safety regulations concerning baggage or to voluntarily leave the plane posed a foreseeable risk of harm. Southwest had in place procedures to deal with an unruly passenger in this situation. Those procedures included clearing the plane of all passengers and seeking the assistance of law enforcement to remove the unruly passenger. (See, e.g., *Rubin v. United Air Lines* (2002) 96 Cal.App.4th 364, 382–385; 49 U.S.C. § 44902 [authorizes an airline to "refuse to transport a passenger or property the carrier decides is, or might be, inimical to safety"].)

7

Southwest employees began to implement these procedures, which meant Lopez ultimately was to be taken off the aircraft. Accordingly, Southwest was fulfilling its obligation as a common carrier to protect its passengers from foreseeable harm by ensuring the boarding safety regulations were enforced and controlling the unruly passenger's dangerous behavior.

What happened next in this case, however, was unforeseeable—that Pickett-Evans would take it upon himself to interfere with Southwest's procedures concerning Lopez by attacking him. Although Rodriguez maintains the assault was foreseeable, he can point to no evidence to support his claim. First, the record fails to show any preexisting animosity between the two men. They were seated rows apart, and there was no suggestion that Pickett-Evans and Lopez had interacted prior to the confrontation. Nor was there evidence of any drunken or violent speech or actions by Pickett-Evans toward anyone either on the plane or prior to boarding that would put Southwest on notice of his potentially combative behavior. (*Terrell v. Key Sys.*, *supra*, 69 Cal.App.2d at pp. 684–685 [train operator liable for injuries caused during an onboard fight based on train personnel's failure to respond to passengers' drunk, boisterous and abusive behavior and previous onboard fights under similar circumstances].)

Second, there were no records of similar incidents that may have made it sufficiently likely an assault would occur in these circumstances. Rodriguez offered no reports of fistfights having previously erupted on Southwest or other airlines when passengers were forced to disembark for safety reasons. (Cf. *Lopez v. Southern Cal. Rapid Transit Dist., supra,* 40 Cal.3d at p. 791 [bus company liable for passenger's assault by fellow passenger based on history of such assaults on the bus route and driver's failure to act to protect passengers or maintain order when notified the assault was occurring]; *Regents, supra,* 4 Cal.5th at pp. 629–630 [task force reports and incidents of unprovoked student violence placed postsecondary schools on notice of possible on-campus student attacks]; *Doe v. Roman Catholic Archbishop of Los Angeles* (2021) 70 Cal.App.5th 657, 676

[Archdiocese's receipt of numerous reports of sexual assaults by clergy in parish schools made foreseeable a priest's sexual abuse of plaintiff at parish school].)

Finally, as the trial court observed, the attack happened in a setting in which airline employees could not control the attacking passenger. It is uncontroverted that Pickett-Evans punched Lopez during deplaning, when passengers were standing, jamming the aisles, and slowly exiting the plane. Further, as Rodriguez testified during his deposition, the entire incident—from confrontation through attack—lasted just one to two minutes, and no crew members were in the vicinity.

The third foreseeability-related factor is the closeness of the connection—or causal nexus—between the defendant's conduct and the injury suffered. In cases like this one involving third party criminal conduct, "the existence of an intervening act does not necessarily attenuate a defendant's negligence. Rather, 'the touchstone of the analysis is the foreseeability of that intervening conduct.' " (*Regents, supra,* 4 Cal.5th at p. 631; see *Kesner v. Superior Court, supra,* 1 Cal.5th at p. 1148.) We see no nexus between the efforts of Southwest employees to ensure passenger safety and the injury sustained by Rodriguez from Pickett-Evans's random attack. In sum, the foreseeability-related factors counsel against imposing a duty on airlines to protect passengers from assaults by fellow passengers in these circumstances.

### 2.     The *Rowland* public policy factors

The public policy factors are "the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved." (*Rowland,* 69 Cal.2d at p. 113; *Cabral v. Ralphs Grocery Co., supra,* 51 Cal.4th at 781; accord, *Issakhani v. Shadow Glen Homeowners Assn., Inc., supra.* 63 Cal.App.5th at pp. 927–928.) The public policy factors

9

also counsel against imposing a duty on airlines to protect passengers from third party assaults in these circumstances.

Moral blame, the first public safety factor, "has been applied to describe a defendant's culpability in terms of the defendant's state of mind and the inherently harmful nature of the defendant's acts. To avoid redundancy with the other *Rowland* factors, the moral blame that attends ordinary negligence is generally not sufficient to tip the balance of the *Rowland* factors in favor of liability. [Citation.] Instead, courts have required a higher degree of moral culpability such as where the defendant (1) intended or planned the harmful result [citation]; (2) had actual or constructive knowledge of the harmful consequences of their behavior [citation]; (3) acted in bad faith or with a reckless indifference to the results of their conduct [citations]; or (4) engaged in inherently harmful acts." (*Adams v. City of Fremont* (1998) 68 Cal.App.4th 243, 270.) Rodriguez offered no evidence that would attribute moral blame to Southwest.

As for the policy of preventing future harm, undoubtedly the airline industry, passengers, and government agree that the need to prevent unruly airline passenger conduct is critical. That need is growing as more airline passengers have returned to flying following the pandemic-related drop in ridership and the number of onboard unruly passenger incidents has increased dramatically. (Bart Elias, Congressional Research Service, Addressing Unruly Airline Passengers (Oct. 19, 2021) p. 1 <https://crsreports.congress.gov> [as of Mar. 11, 2022], archived at <https://perma.cc/E3HF-G58G>.) The "Federal Aviation Administration (FAA) received more than 4,000 reports of unruly behavior onboard aircraft" in the first nine months of 2021. During that same period, the FAA "initiated more than 800 investigations of unruly passenger conduct," "more than a five-fold annualized increase compared to recent years in which annual totals were below 200." (*Ibid.*)

The question, however, is whether mandating that airlines be responsible for preventing fistfights between passengers like the one in this case is feasible without imposing an unrealistic and unacceptably

10

heavy burden on both airlines and passengers. Short of having airlines require that passengers (1) be screened for emotional stability before boarding; (2) remain strapped in their seats under the watchful eye of onboard security guards; (3) and submit to having security guards escort them to and from the rest rooms and the aircraft, we can envision no practical, cost effective, and tolerable means of safeguarding passengers from such unforeseen attacks and controlling such unforeseen attackers.

Rodriguez responds with three arguments. First, he contends that Hardin breached his duty as an operations agent by failing to follow Southwest's Ground Operations Manual to "provide[] friendly service to and [to] maintain[] positive relationships with all internal and external Customers." Rodriguez contends Hardin's rude and aggressive behavior was a substantial factor "in causing the totality of circumstances surrounding [his] injury." Second, Rodriguez contends Hardin breached his duty by not following procedures for removing unruly passengers as specified in the manual. Third, Rodriguez contends the flight attendant in the back of the plane was unprepared for the assault. The crux of Rodriguez's argument is the employees' breach of their duties and failure to maintain order caused rising tensions among the passengers, making the assault foreseeable.

The problem with Rodriguez's argument is that it is addressed to the elements of breach and causation for a negligence cause of action, not to the element of duty, which is to be established first. And while a workplace manual may be used as evidence of breach of duty, it cannot substitute for the judicial determination of whether a duty was owed. (*Minch v. Department of California Highway Patrol* (2006) 140 Cal.App.4th 895, 908; see also *Fireman's Fund Ins. Co. v. Security Pacific Nat'l Bank* (1978) 85 Cal.App.3d 797, 829.) Otherwise, Rodriguez has not engaged in a duty analysis. To be sure he refers to the *Rowland* factors. But he fails to consider the foreseeability-related factors and public policy factors in the context of this case to determine whether to depart from the duty to protect that is implicated by the

11

special relationship.  The summary judgment motion was properly granted.

## DISPOSITION

The judgment is affirmed.  Southwest Airlines Co. is to recover its costs on appeal.


LUI, P. J.

We concur:


ASHMANN-GERST, J.


HOFFSTADT, J.